SILVER, J.,
with whom JABAR, J., joins, dissenting.
[¶ 26] I respectfully disagree with the Court’s conclusion that the trial court properly excluded evidence of subsequent remedial measures. More importantly, I disagree with the Court’s finding that the evidence presented at trial failed to generate the Estate’s requested jury instruction concerning PINH’s negligent communication of Vera Boulier’s care plan. The Estate presented evidence of PINH’s negligence — independent of Wendy Charette’s individual actions — and requested appropriate jury instructions. The trial court denied the Estate’s request for these instructions based on its misinterpretation of Levesque v. Central Maine Medical Center, 2012 ME 109, 52 A.3d 933, thereby precluding the jury from considering one of the Estate’s most significant theories of liability.
A. Subsequent Remedial Measures
[¶ 27] First, I disagree with the Court’s analysis and conclusion that the trial court did not abuse its discretion by excluding evidence that PINH instructed nurses to carry gloves following Boulier’s accident. Rule 407 permits admission of *1178 evidence of subsequent remedial measures for the purpose of demonstrating the feasibility of those measures once a party has controverted feasibility. M.R. Evid. 407(a). The rule also permits admission of such evidence for impeachment purposes. Id.
[¶ 28] The Court’s observation that the feasibility of requiring nurses to carry gloves was addressed and conceded before trial is simply incorrect. PINH’s motion in limine sought specifically to exclude evidence that PINH installed glove dispensers in residents’ bathrooms after Boulier’s fall, and indicated that the nursing home would not controvert the feasibility of mounting such dispensers. The parties’ pretrial motions contain no mention of the feasibility of instructing nurses to carry gloves. It is therefore inaccurate to say that PINH unequivocally conceded feasibility of this remedial measure. Consequently, Albrecht v. Baltimore & Ohio Railroad Co., 808 F.2d 329 (4th Cir.1987) is not instructive.
[¶ 29] The Court also asserts that the Estate elicited the only evidence concerning infection control as a reason not to carry gloves. Court’s Opinion ¶ 20. PINH makes a similar assertion in its brief. However, it is simply untrue. The Estate asked Charette on direct examination whether the decision not to carry gloves was her own personal decision. In response, she stated that she felt it was an infection control issue. The Estate’s follow-up consisted of clarifying Charette’s answer and establishing that Charette made this decision on her own, without any direction from PINH. On cross-examination, however, PINH pressed the issue, even going so far as to elicit highly prejudicial and only tangentially relevant testimony that Boulier had MRSA — an infection which PINH’s counsel characterized in front of the jury as “not something you want to have” — to bolster Charette’s explanation. Once this information had been elicited, the Estate on redirect further questioned Charette about her decision not to carry gloves. It was not until Char-ette’s entire testimony had concluded that the Estate argued to the trial court that the feasibility of the practice of carrying gloves had been controverted.
[¶ 30] Charette’s testimony effectively controverted the feasibility of requiring nurses to carry gloves. The specific issue of infection control was first raised in a nonresponsive answer to the Estate’s question about whether the decision not to carry gloves was Charette’s own. Her statements were not a blanket denial of liability. On the contrary, she gave a specific explanation as to why these measures were not undertaken. Even though she testified that she made the decision without consulting any of her supervisors at PINH, her testimony indicated to the jury that, as a PINH employee, she did not carry gloves on her person because it would be unsafe to do so. PINH played a significant role in unnecessarily elaborating on this testimony, and the bulk of the Estate’s questioning on the issue occurred on redirect examination. Rule 407 explicitly permits the Estate to refute Charette’s assertions and to demonstrate that it would, in fact, have been feasible for nurses to carry gloves.
[¶ 31] At the very least, the trial court should have admitted evidence of the directive for the limited purpose of impeaching Charette. Her testimony left the jury with the false impression that carrying gloves posed a serious health threat. PINH’s swift response to Boulier’s fall, directing all nurses to carry gloves with them at all times, indicates that quite the opposite is true. The prejudice resulting from this error was somewhat alleviated when one of PINH’s witnesses testified *1179 that carrying gloves would not create a risk of spreading infection as long as nurses followed appropriate precautions. Nevertheless, the exclusion of evidence that PINH nurses were instructed to carry sanitary gloves soon after Boulier’s fall was an abuse of discretion.
B. Jury Instructions
[¶ 32] As the Court explains, the trial court improperly denied the Estate’s proposed jury instruction based on its misapplication of Levesque. I disagree, however, with the Court’s conclusion that the Estate was not entitled to its requested instruction.
On review, a party may establish entitlement to a proposed jury instruction only where the instruction was requested and not given by the court and it: (1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing; and (4) is not otherwise sufficiently covered in the court’s instructions.
Kezer v. Cent. Me. Med. Ctr., 2012 ME 54, ¶ 26, 40 A.3d 955 (quotation marks omitted). The Estate’s proposed jury instruction states the law correctly and is not misleading or confusing. The trial court’s instructions did not sufficiently cover the Estate’s proposed instruction, because the court’s instructions did not permit the jury to consider PINH’s liability for negligently communicating the care plan. Thus, the Estate was entitled to its proposed instruction if it requested the instruction and if the evidence presented at trial generated the instruction.
[¶ 33] As the Court notes in its majority opinion, the Estate clearly requested instructions involving the communication of the care plan. On the record, the Estate made the following request:
[T]his claim of the nursing home’s negligence has been there from day one. The defendant has always been the Presque Isle Nursing Home. All of the conduct that led up to Vera Boulier being left alone in the bathroom and falling has been fully litigated and should be able to be presented and argued to the panel.
[¶ 34] However, the Court finds that the Estate was not entitled to the requested instruction because it did not present sufficient evidence at trial to generate the instruction. Court’s Opinion ¶25. I disagree. An instruction is generated if it “appears to be supported by the facts of the case.” Mixer v. Tarratine Mkt., 1999 ME 27, ¶ 6, 724 A.2d 614. As the Court discusses, to generate the requested instruction regarding PINH’s professional negligence, the Estate needed to present sufficient evidence of the appropriate standard of care, evidence that the defendant deviated from that standard, and evidence that the deviation caused the plaintiffs damages. Court’s Opinion ¶ 24. The facts of this case support each of these elements, at least to the extent necessary to generate the requested instructions.
[¶ 35] On the issue of the appropriate standard of care, the Court notes that the Estate presented testimony that updates to a resident’s care plan must be communicated to the nurses when they begin their shifts. Court’s Opinion ¶ 25. However, this was not the only evidence of the relevant standard of care. The Estate established at trial that PINH’s Director of Nursing or another registered nurse creates a care plan for each patient based on the individual patient’s needs and difficulties. This plan is revisited and updated as the patient’s needs change. The care plan is intended to communicate the patient’s needs to other nurses, including CNAs, who work with the patient. Jeanne Deli-cata, PINH’s expert witness, testified that it was “absolutely” critical that the care *1180 plan be clearly communicated down the line, and that the key to implementation of the care plan is clear communication of the plan to the LPNs, who are the charge nurses on each shift. Further, she testified that it is critical that the care plan be clearly communicated so that a CNA can follow the plan without attempting to individually assess what type of care the patient requires. This guidance is necessary because, as Sandra LaPorte, the Estate’s expert witness, testified, CNAs “do not possess the education level or ability” to independently make the types of decisions provided for in the care plan. LaPorte also testified that it is extremely important that the individual items of a care plan be clearly communicated down the hierarchy of nurses to the CNAs who provide hands-on care, and that the daily shift report was one of the requirements in place to facilitate this.
[¶ 36] The Estate presented evidence from which a jury could conclude that PINH failed to meet this standard of care. Charette testified that she would refer to the actual care plan only if any changes were brought to her attention. Further, she explained that CNAs were each provided with an assignment card, which condensed specific information from the care plan, and that these cards informed her of what she needed to do as a CNA to care for the resident. Charette explained that the care plan itself contained more detailed information than was reflected on the assignment cards, and it also included information that was outside of her medical expertise. She testified that nobody ever told her specifically where she was supposed to stand or be with Boulier when Boulier was in the bathroom, and that there were no training sessions during which the care plan was explained or taught to her. It was her understanding that she was supposed to stay in the area of the bathroom because the care plan did not specify that she needed to physically stay with Boulier in the bathroom. On the other hand, LaPorte testified that the language of the care plan clearly required that a staff person needed to remain with Boulier in the bathroom.
[¶ 87] Based on this testimony, the jury could have concluded that the standard of care requires clear communication of the care plan, and that the care plan required a staff person to remain in the bathroom with Boulier at all times. Char-ette testified that she regularly received updates when coming on shift; she also testified that these reports typically included only changes to the care plan. Further, she testified that she did not understand the care plan to require that she stay in the bathroom, that nobody ever told her where she was supposed to be when Boulier was in the bathroom, and that she had not been trained in the meaning of the care plan. From this evidence, a jury could have concluded that Charette did not understand the care plan because PINH failed to clearly communicate the meaning of the plan to her.
[¶ 38] Finally, this evidence was sufficient to establish a potential causal link between the alleged negligent communication of the care plan and Boulier’s injuries. The Estate argued throughout the trial that Charette’s distance from Boulier contributed to Boulier’s fall and resulting injuries. Specifically, in its opening statement, the Estate explained:
[I]t is critically important, you will hear, that the chain of communication from this care plan be clear and concise all the way down the line to the licensed practical nurse and the CNAs. They have to know what the care plan means and what they are supposed to do in any given situation that they come across with a patient ... The reasonable alter *1181 native for the nurse should have been— she should have been instructed that if she found Vera in such a position, use the call bell and call button in the bathroom and call for help, have somebody come in ... Because leaving her alone dramatically increased the risk that the inevitable was going to happen and she was going to fall.
[¶ 39] If the jury believed that the care plan required Charette to stay with Boulier in the bathroom, that PINH did not adequately communicate this requirement, and that Charette’s distance from the bathroom resulted in Boulier’s injuries, then the jury could have found PINH liable for negligent communication irrespective of whether Charette was individually at fault. However, the jury was not even allowed to consider this theory of liability because the trial court misapplied Levesque and inappropriately analyzed the Estate’s request for the instruction concerning PINH’s liability. See Court’s Opinion ¶¶ 21-28. As a result of the trial court’s error, the jury was required to review Charette’s negligent conduct in isolation, disregarding a substantial portion of the Estate’s case.
[¶ 40] The Court suggests that the Estate failed to argue at trial that the care plan had been negligently communicated. Court’s Opinion ¶ 25 n. 9. This observation overlooks that the trial court’s ruling on jury instructions, made prior to closing arguments, foreclosed this argument. Although PINH’s defense strategy was to focus exclusively on Charette’s actions in the context of her relationship with Boulier, the Estate, both in its opening statement and throughout its examination of witnesses at trial, emphasized PINH’s responsibility to clearly communicate the care plan. Accordingly, the Estate was entitled to its requested jury instruction.
C. Prejudicial Error
[¶ 41] Where, as here, a party properly preserves an objection to jury instructions, an error in the instruction is reversible if it results in prejudice. Wahlcometroflex, Inc. v. Baldwin, 2010 ME 26, ¶ 14, 991 A.2d 44. In this case, the court’s failure to provide properly requested instructions about PINH’s potential liability for negligent communication of the care plan resulted in obvious prejudice to the Estate. The trial court deprived the Estate of the opportunity to have the jury consider one of its primary arguments for liability. In light of the limited instructions the jury received, the verdict indicates only that the jury concluded that Charette did not act negligently given the situation she was in. See Niedojadlo v. Cent. Me. Moving Storage Co., 1998 ME 199, ¶ 6, 715 A.2d 934 (“We presume that the jury follows the trial court’s instructions.”); Michaud v. Steckino, 390 A.2d 524, 536 (Me.1978) (“It must be presumed that the jurors were influenced in their verdict only by the law as given to them by the trial justice ... ”) (emphasis in original). The jury did not have occasion to consider whether PINH negligently placed Boulier in an unsafe situation by failing to adequately inform nursing staff of safety protocol. This Court should not speculate as to how a jury would find if given the opportunity to consider a broader theory of PINH’s liability, rather than a theory focused exclusively on the actions of a single CNA.
[¶ 42] The trial court improperly limited the jury instructions based on its over-reading of Levesque. The Estate requested appropriate instructions and presented evidence sufficient to generate those instructions. Nevertheless, the trial court denied the Estate the opportunity to have an essential component of its case considered by the jury. Accordingly, I would vacate the judgment and remand for a new *1182 trial with appropriate jury instructions on all potential theories of liability generated by the evidence.